### HILL v. HUNTER.

(Court of Civil Appeals of Texas. Austin. April 16, 1913. Rehearing Denied May 14, 1913.)

1. LANDLORD AND TENANT (§ 114*)—TENANCY AT WILL—OCCUPANCY UNDER AGREEMENT INDEFINITE AS TO TERMS.

Where a lessee held over after a yearly tenancy under an agreement that he might have the premises as long as he paid the rent, the tenancy is one from year to year and not a perpetual tenancy.

[Ed. Note.—For other cases, see Landlord and Tenant, Cent. Dig. §§ 373–381; Dec. Dig. § 114.*]

2. CONTRACTS (§ 10*)—LANDLORD AND TENANT (§ 86*)—MUTUALITY—CONSIDERATION.

Where one was in possession of premises as lessee paying a fixed annual rental, an agreement on the part of the lessor that he should have the premises as long as he paid the rent is not enforceable, being a mere unilateral contract, as there was no consideration for the extension of the term.

[Ed. Note.—For other cases, see Contracts, Cent. Dig. §§ 21–40; Dec. Dig. § 10;* Landlord and Tenant, Cent. Dig. §§ 270–275; Dec. Dig. § 86.*]

3. FRAUDS, STATUTE OF (§ 58*)—CONTRACTS RELATING TO LAND.

Under the statute of frauds, subd. 4, a perpetual tenancy, whereby the lessee was to have possession of the land as long as he paid the yearly rental, is void unless created by an instrument in writing.

[Ed. Note.—For other cases, see Frauds, Statute of, Cent. Dig. §§ 90, 91; Dec. Dig. § 58.*]

4. FRAUDS, STATUTE OF (§ 129*) — AGREEMENTS RELATING TO LAND—EXCEPTIONS.

Where defendant, who was in possession of land as lessee, borrowed money to pay a debt due his lessor for purchase of property, and also to pay part of the rent upon which he was behind, relying on the lessor's statement that he might have the land as long as he paid the rent, such transaction will not take the agreement out of the statute of frauds; the lessee in no way changing his position to his detriment.

[Ed. Note.—For other cases, see Frauds, Statute of, Cent. Dig. §§ 287–292, 303, 306–308, 311, 314, 318–320, 322, 325, 326; Dec. Dig. § 129.*]

5. BROKERS (§ 54*)—COMMISSIONS—RIGHT TO COMMISSION.

One engaged to sell land cannot claim commission until he has produced a purchaser not only willing but ready and able to purchase, and proof of his ability to purchase is an essential to recovery.

[Ed. Note.—For other cases, see Brokers, Cent. Dig. §§ 75–81; Dec. Dig. § 54*]

---

*For other cases see same topic and section NUMBER in Dec. Dig. & Am. Dig. Key-No. Series & Rep'r Indexes

Appeal from District Court, Travis County; Chas. A. Wilcox, Judge.

Action by W. D. Hunter against J. T. Hill, who filed a cross-action. From a judgment for plaintiff, which denied relief on his cross-action, defendant appeals. Affirmed.

W. R. Allen and Albert S. Phelps, both of Austin, for appellant. Fiset & McClendon and D. K. Woodward, all of Austin, for appellee.

KEY, C. J. Appellant's brief contains the following statement of the nature and result of the suit:

"This suit was instituted by appellee, W. D. Hunter, against appellant, J. T. Hill, in the district court of Travis county, Tex., on the 4th day of January, 1912, for the possession of 1,572 acres of land situated in Travis county, and the said W. D. Hunter on said day sequestered said property, and later, within the time prescribed by law, the said J. T. Hill replevied the same. The facts of the case, briefly stated, are substantially as follows:

"On January 1, 1907, W. D. Hunter rented his farm, consisting of 1,572 acres, situated in Travis county, to his son-in-law, J. T. Hill, for the sum of $5,000 per year, the said Hill to manage, cultivate, and run the farm, at which time the said W. D. Hunter sold to said J. T. Hill some mules, wagons, and farming implements, for the purpose of cultivating said farm, for the sum of $3,000, retaining a mortgage lien on same; at the end of 1907 the lease of said farm was extended, and said Hill occupied and farmed said place for the year 1908; and the said Hill, at the end of 1908, continued to farm said place under an agreement between said W. D. Hunter and himself up to and including the year 1911, the said Hunter renting said place to the said J. T. Hill for the sum of $5,000 a year upon a verbal understanding and lease.

"There is a dispute as to what the contract of lease between appellee and appellant was after the year 1908, the relation of landlord and tenant continuing without any written contract; appellant J. T. Hill claiming that the said W. D. Hunter rented and leased the premises to him as long as he (Hill) would pay the $5,000 rent per year, and that it was the understanding and agreement between said parties that the said Hill was to have the privilege of leasing said farm as long as he paid said rent, and that said contract was solely dependent upon this fact and contingency (that is to say, said Hill's lease depended upon the contingency as to whether he paid the rent for each year); and in the event he (Hill) paid said rent he was to continue on said place. The appellee Hunter denies that he had this agreement with Mr. Hill.

"In 1910 J. T. Hill got behind in the payment of the rent for the place, and the said W. D. Hunter requested that Mr. Hill see Mr. Lynn Hunter and get him to advance the money to pay off said back rent, and promised the said Hill that if he (Hill) would do this he would let him have the place as long as he kept the rent paid up, as agreed upon. Later the said W. D. Hunter requested J. T. Hill to see Lynn Hunter again and ascertain whether he would pay off the $1,500 that was still due on the mules and farming implements, and pursuant to this request said Hill saw Mr. Lynn Hunter and got Mr. Lynn Hunter to pay off said indebtedness, as the said W. D. Hunter had requested; the said W. D. Hunter assuring the said Lynn Hunter and the said J. T. Hill that if he would pay the same off he (W. D. Hunter) would allow said Hill to stay on the place as long as he paid the rent, and, on the strength of said representations, the said J. T. Lynn Hunter at the request of J. T. Hill and for his benefit, and for the benefit of W. D. Hunter, paid off said debt as he had paid the other one. That, notwithstanding the said agreement and promise of W. D. Hunter that his said son-in-law, J. T. Hill, could occupy the place as long as he paid the rent, provided said Hill would get Lynn Hunter to pay off said indebtedness, both as to the rent and personal property aforesaid, later the said W. D. Hunter, on the 17th day of October, 1911, demanded that the said Hill vacate said premises, which the said Hill refused to do, having some time before that paid the rent of said place for the year 1911 to W. D. Hunter, who had by his promises obligated himself to let Mr. Hill have the place for another year, or as long as he paid the rent.

"Appellant, J. T. Hill, answered by general demurrer, special exceptions, and specially answered setting up substantially the facts above stated, pleading among other things that the said lease was a continuing one and was in full force as long as appellant paid the appellee the rent, and that the lease was one that could or could not be performed within a year, and was dependent upon the fact as to whether the said Hill paid the rent, and the same was not subject to the statute of frauds; and that the promise made by the said W. D. Hunter to J. T. Hill and Lynn Hunter that if Hill would get Lynn Hunter to pay off certain indebtedness on personal property and the rent, he (W. D. Hunter) would allow Hill to rent the place as long as he paid the rent, which the said Lynn Hunter paid to the said W. D. Hunter for his benefit, and the same constituted a valid consideration for said promise, which redounded to and subserved the interest of said W. D. Hunter, and he could not be heard to say that the statute of frauds applied, for the consideration that he received took the same out of the statute of frauds.

"Appellant Hill pleaded also a cross-action against W. D. Hunter for the sum of $7,875, being for commissions due him by the said

Hunter for obtaining a purchaser for said place, while the said Hunter had it in the said Hill's hands for sale.

"The case was tried before a jury, and, after all the evidence was in, the court, upon motion of the plaintiff, W. D. Hunter, instructed the jury peremptorily to find a verdict for the plaintiff and against the said J. T. Hill on his cross-action, and the jury returned a verdict as instructed, and judgment was entered accordingly.

"Later the defendant, J. T. Hill, moved the court for a new trial, which was overruled on the 13th day of April, 1912, to which defendant Hill excepted, and in open court gave notice of appeal to the Court of Civil Appeals for the Third Supreme Judicial District of Texas, and appellant has perfected his appeal, and the case is now before this court for submission and decision."

Appellant contends that the question of the plaintiff's right to recover the land, and appellant's right to recover upon his cross-action, should have been submitted to the jury, and also contends that error was committed in excluding certain testimony. Counsel for appellee, in a well-prepared brief, controvert appellant's contention and urge several reasons in support of the course pursued by the trial court, some of which reasons meet the approval of this court and lead to an affirmance of the judgment. The proof shows that appellant took possession of the land under the following written contract:

"This contract made between W. D. Hunter and J. T. Hill for the year 1907, witnesseth:

I rent Hill my Del Valle farm in Travis coun-
ty for .......................................... $4,000
Gin and fixtures for............................. 1,000
                                                 ———
   Total .......................................... $5,000

"Hill keeps up his own machinery for year 1907. I sell the said Hill 18 mules and 1 bay pony, 4 wagons and all the implements only belonging to me for the sum of $3,000. Said Hunter excepts the farming implements that Orange Battle and his son-in-law has. Said Hill agrees to fix fencing, Hunter furnishing material. I except one-fourth of pecans and one cow and calf. Said Hill pays interest on $3,000 from the 1st of January, 1907, for stock and farming implements at the same rate I have to pay interest. Said Hill agrees to turn over all the proceeds of the crop of 1907, also all seed hauled from gin. Said Hill is not to trade or sell mules without Hunter's consent. Said Hunter agrees to furnish such help as is necessary to make crop. Said Hill paying Hunter the same interest he has to pay. I will pay for putting up houses that may be necessary to help make crop. Hill's contract is for year 1907, only, unless extended.

"Signed this 1st day of January, 1907.
                              "W. D. Hunter.
                              "J. T. Hill."

We copy from appellee's brief a fair summary of the testimony bearing upon the question of appellant's right to retain possession of the premises after the year 1911:

"Plaintiff introduced in evidence the contract for the year 1907, and the extension thereof for 1908, between the plaintiff and defendant, which were in writing and signed by both parties. This contract and extension are in the same words as copied in plaintiff's petition and as heretofore copied in this brief. Plaintiff also introduced the notice given by plaintiff to defendant on October 17, 1911, demanding possession on January 1, 1912. The defendant admitted that said notice was received by him on October 24, 1911. The plaintiff also proved by the ex parte deposition of defendant that the above lease and memorandum thereon extending the same for the year 1908 was the only writing between plaintiff and defendant in regard to the tenancy.

"The defendant, after identifying the lease contract of 1907 as the one executed by himself and plaintiff, testified that in the fall of 1909 he asked the plaintiff if they had not better have another written contract, to which plaintiff replied: 'There is no need of a contract, Joe; there was no use of any at the start; I am as good as my word; my word is as good as my contract; whatever I say I will do, I will do, and it is not necessary to go into writing about it; just go on like you are; you know as long as you comply with your part of the contract I'll comply with my part of it.' He further stated in regard to this conversation that when he asked for another contract plaintiff said: 'No, it was not necessary; that I knew our understanding; and that as long as I paid the rent I could keep the place.'

"He further stated that in the fall of 1910 he went to J. L. Hunter to get that part of the rent that he had failed to make off of the place; he had a conversation with plaintiff at the State National Bank with regard to the renters who were coming to him. That conversation is described by defendant as follows: The plaintiff said, 'Joe, what is the matter?' and told me that a Mexican and negro that lived on the place had come over to see him about renting land, and he asked me, 'Ain't you going to keep the place?' I said, 'Why, yes, yes, yes, Mr. Hunter, what is the matter?' He said, 'Well, they came and asked me to get this land if you didn't keep the place, and I thought maybe you were not going to keep it.' I said, 'No, I could not afford to quit, owing you for all these mules.' He said, 'Well, I told them to go to you; that you had it as long as you paid the rent and owed for this other stuff; and that I hadn't a thing in the world to do with it.' He further stated that the original amount for the mules was $3,000, which had been reduced down to between $1,200 and $1,300; that plaintiff in the fall of 1910 suggested that

he get the money from J. L. Hunter to pay off the mule debt; that he followed plaintiff's suggestion and went to Lynn Hunter and got the money; that plaintiff said if he could do such a thing it would suit him, as he (plaintiff) was in bad health; and that if he (defendant) could get the money and pay him off he would owe plaintiff nothing but the rent, and in case plaintiff should die it would be easier on his wife, and so defendant would owe plaintiff only $5,000 each fall. He quotes plaintiff as saying: 'You go and get it, if you can, Joe, and it would relieve me very much, because I would know then Fannie [plaintiff's wife] wouldn't have anything to bother about.' The defendant further stated that he used a great deal of money running the place, and 'whatever I needed I went to Mr. W. D. Hunter, and he charged me with what interest he had to pay, and he said it would get it in better shape and make it easier on Fannie if he should lie down and die.' Defendant testified that he followed out this suggestion, got the money from Mr. J. L. Hunter, and paid plaintiff; Mr. J. L. Hunter furnishing the money and taking up the mortgage. In this same connection defendant further said: 'As to what Mr. W. D. Hunter told me then with regard to keeping the place as long as I 'paid the rent, he said it would be the same as if he still held the mules; that as long as I paid the $5,000 there would be no change. The only thing about the $1,200 was to get myself in position so I would not bother his wife in case he laid down and died; that is what he claimed.'

"Defendant further stated that he was short in the rent of 1910, and 'in January, 1911, I went to Mr. J. L. Hunter to get him to pay the balance of that rental. Mr. W. D. Hunter asked me to go to Mr. J. L. Hunter again, and said he had told Lynn Hunter how our trade was and he would understand it; that I was to have the place as long as I paid the rent; he told me that he had told Lynn Hunter about it a few days before.' After stating that plaintiff said he had told Lynn Hunter he 'could keep the place as long as he kept up the rent,' he quotes plaintiff on this occasion as saying: 'Knowing that, and having a mortgage on your mules, he will help you, I believe; go to him and l believe he will help pay the balance.' He further quotes the plaintiff upon the same occasion as follows, 'Joe, you know that has been our understanding all the time;' also, 'That has been our understanding all the way through, that as long as you paid the rent you could have it, but if you could not pay it you were to give it up; you know that.'

"With regard to exchange of places which defendant says was in the fall of 1910, he quotes plaintiff as saying: 'Joe, to show you that I am trying to do what is right and because your wife has died, I will make you this proposition: You go over and take the home place; there is 2,400 acres in that; you have run the other place and made a success of it; I'll turn you over the gin; you can have that, and it will keep peace; let Hal have the other place.' To which defendant replied: 'Mr. Hunter, I will do that. You know that I would not do anything to contrary you; I have never done that.' Plaintiff said: 'No, Joe, you have always been a good boy, and, if you will do that, everything will go all right.' To which defendant replied: 'All right, sir.' This conversation was placed at a barber shop in Austin, and defendant stated that the next morning before breakfast he had a telephone call from Mr. Armstrong to meet him at the river. They met, and Mr. Armstrong stated: 'Mr. Hill, Mr. Hunter came home last night and got to talking about this change, about you taking the place over home and me come over here. The old man got hot, and I never saw him in such a fix in my life. After the old man talked to us, Mother and I had a conversation.' Witness says that then Mr. Armstrong told him that Mr. Hunter wanted him to stay where he was; that the next time he saw plaintiff, which was probably three or four days or a week later, he said to plaintiff, 'Mr. Hunter, Hal tells me you want to stay where I am and he stay here where he is and go on and help you.' Plaintiff replied: 'Yes, Joe, stay where you are.' Defendant said: 'Well, everything is all right; I am to stay where I am and go on?' Plaintiff said: 'Just the same, Joe; everything is settled now and all right. That is all that was ever said about that.'

"Witness further testified with regard to the conversation in the fall of 1910 at the State National Bank as follows: Plaintiff said: 'Joe, that boy is coming down to my house every day, Hal, I mean; they are trying to make me take this place away from you and let Hal run it, he and Fannie. I told them I wouldn't do it, because I had promised you as long as you kept this rent paid you could have it, and I stick to it.'

"On cross-examination the defendant stated that the conversations in which Mr. Hunter told him he could have the place as long as he paid the $5,000 rent were always in the fall; that he (defendant) spoke to the plaintiff about it every time they would make a settlement. 'I would say, "Well, have I got it for another year?" And he said, "Yes, Joe, as long as you pay the rent." There was nobody present at those conversations; I never thought it was necessary to have any one present. The first conversation of that sort was in the fall of 1909. The next one was in the fall of 1910, at the time I paid the rent. The last conversation I had with him about the rents was the time I went to his house and talked to him and his wife, and he advised me to go to Lynn Hunter to get him to pay the balance; it was just a little while before Christmas in 1910, after I had gather-

ed all my crop and had in everything. We had not had any conversation in regard to my rent or my staying there as long as I paid the rent after the fall of 1909, until this conversation in the fall of 1910; there was nothing said about it in the early part of 1910.'

"The witness detailed also the conversation which took place at the time he was short on the rent and about plaintiff's suggestion that he go to Lynn Hunter, whom the defendant already owed, to get Lynn Hunter to take up the mortgage and pay the balance on the rent; it appears from this conversation that the defendant was short on the rent because he had sold all the cotton and paid Lynn Hunter $1,000, thinking that he would have enough to pay the plaintiff. In this conversation the defendant says that the plaintiff told him that he had already told Mr. Lynn Hunter what the arrangements between plaintiff and defendant were, and that the defendant could stay there as long as he would pay the rent, and that Lynn Hunter understood and would take up defendant's indebtedness if defendant would go to him. Defendant stated that he went to see Lynn Hunter the next morning, and the next conversation he had with plaintiff was in January, 1911, some time after Lynn Hunter had paid the plaintiff. At this last conversation, about January 15, 1911, the plaintiff told defendant that the rent was paid and everything was all right and said, 'Just go ahead, Joe, just like you always have.'

"The defendant also offered the testimony of several witnesses who testified to conversations at various times between the plaintiff and said witnesses. We do not consider that these conversations amount to more than corroborative testimony in support of the defendant's testimony, as above outlined. We will, however, give the court the benefit of these several conversations.

"Mit C. Taylor testified to a conversation between himself and plaintiff at Webberville in the fall of 1910, the details of which are as follows: 'Mr. Hunter came down to have his horse shod and his surrey fixed up, and I got to talking with him, and I told him I was going to move over to Mr. Jones,' right across the creek from Mr. Hill, and that I heard Mr. Hill and his folks had to leave, and I was thinking I would be neighbors with them, or something like that, and he said, 'No, not as long as Joe pays me the rent.'

"J. L. Hunter testified that in January, 1910, after he had loaned Mr. Hill some money, he had a conversation with plaintiff in which the latter stated that he had seen that witness had taken a mortgage on Mr. Hill's stuff, and plaintiff said: 'Well, that's all right; I consider Joe all right; and I think he is going to pay out, and as long as he is able to pay the rent on the place he is going to stay there, and I don't think you'll have any trouble in getting your money back; don't think you stand any chance of losing anything.' This same witness testified to the same conversation later on as follows: Plaintiff said: 'I understand that you have taken up his mortgage on those mules and implements and that Joe owes all that he is owing you on those things.' Witness then questioned the plaintiff about the matter, and plaintiff said: 'You'll get your money, because Hill is on my place, and as long as he pays his rent he will stay there and will work it out, and you will not lose anything.' This conversation was in January, 1910, and the witness stated that he had already loaned Hill the money at the time he had this conversation with the plaintiff. The witness further testified that he had no recollection of having any other conversations on this subject until January, 1911. The second conversation was in regard to some rent that Hill owed plaintiff, and his recollection was that this conversation took place at the same time he paid plaintiff defendant's rent, but after he had taken the mortgage from defendant. Witness gave plaintiff a note for the rent in 1911, but could not find the note, although he had sent the money to the bank and paid it. Witness further stated that there was a paper executed between himself and plaintiff in regard to the transaction, but he did not have the paper and did not remember the contents of it.

"Littlepage Hill, son of defendant, testified that he was present in the fall of 1910, when the conversation between plaintiff and defendant took place at the State National Bank; that plaintiff · stated to defendant that the renters were coming to him to rent the land, and he had told them they would have to go to defendant, to whom plaintiff had rented, 'and as long as he paid the rent they would have to rent from him; that he himself had nothing to do with it.'

"L. D. Hill, another son of defendant, testified that he was present in 1910 when the conversation took place between plaintiff and defendant at the Central Barber Shop in regard to the defendant taking the home place and letting Armstrong have the place in suit. He stated that defendant said he would not like to take that big a place for just one year, unless he had a written contract. 'Grandpa said there was not any use to have a written contract; that he could have that place just like the other place, as long as he paid the rent.'

"Plaintiff denied having ever told the defendant he could have the place as long as he paid the rent, but we do not deem it necessary to set out the testimony of plaintiff in this regard, as the assignments of error in question are based upon the sufficiency of the testimony to submit the case to the jury."

[1] Counsel for appellee contend, and we sustain the contention, that a lease of prem-

ises for a term "as long as the tenant pays the rent" is, on account of the uncertainty of its duration, a tenancy at will; and that in the case at bar, by reason of the holding over under a yearly tenancy, and the fact that the property consisted of a farm rented by the year, the tenancy should be construed to be from year to year. Lea v. Hernandez, 10 Tex. 137; Beauchamp v. Runnels, 35 Tex. Civ. App. 212, 79 S. W. 1105; San Antonio v. French, 80 Tex. 575, 16 S. W. 440, 26 Am. St. Rep. 763; Murray v. Cherrington, 99 Mass. 229; Corby v. McSpadden, 63 Mo. App. 648; Ashley v. Warner, 11 Gray (Mass.) 43; Western Transportation Co. v. Lansing, 49 N. Y. 499; Heck v. Borda (Pa.) 6 Atl. 392; Gardner v. Hazleton, 121 Mass. 496; Sarsfield v. Healy, 50 Barb. (N. Y.) 245; The Bishop of Bath's Case, 6 Coke, 35.

"The continuance of a term of years constitutes an essential part of a contract and must be ascertained with certainty at its commencement; Otherwise the lease will create but a tenancy at will or from year to year, if it be not wholly void, as if it be to hold until a child, then unborn, shall be of full age, or so long as a certain individual shall continue parson of Dale; this will in either case constitute but a tenancy at will, because of the uncertainty that the child will ever arrive at that age, or that the individual in question will continue parson of Dale." Taylor, Landlord and Tenant, § 75.

In Murray v. Cherrington, above cited, a lessee claimed the right to hold the premises for two years under a letter from the lessor providing that the tenancy should begin as soon as the premises were ready for occupancy. But, "in case after two years subsequent to your moving into said house I should wish to live in the house myself, I can do so, and that then you may still retain, if you wish so to do, the second floor and front chamber and bedroom adjoining, for such a term as may be agreeable to us both." The defendant entered, and, in less than two years from the date of the letter, proceedings were instituted to remove him. The court said: "We are of opinion * * * that the term of this letter did not create an estate for years, namely, a lease for two years, between the parties. The duration of a lease for years must be certain; this includes both its commencement and termination. It may be conceded that a lease for years may begin 'when a house is suitable to be occupied,' according to the maxim, 'Id certum est quod certum reddi potest.' But the fatal objection remains that no period of termination is fixed by this letter. A leasehold interest for an uncertain and indefinite term is an estate at will only. Shaw, C. J., in Cheever v. Pearson, 16 Pick. [Mass.] 271; Bishop of Bath's Case, 6 Coke, 35, Bac. Ab. Lease, L. 3. It is indisputable that an entry by the lessee under this instrument would not bind him to remain for any definite period. He could terminate his tenancy in the modes provided by statute. As to him there is no term of certain duration. Consequently there can be none as to the landlord. The proviso that after two years from the commencement of the occupancy the landlord may live in the house if he wishes to do so, and that the tenant may still retain, if he wishes, certain rooms, cannot change that construction. This clause has no tendency to show that the tenant was bound to remain during two years."

The principle that a lease must as to its duration be certain or refer to a certainty is thus tersely stated by the learned English jurist in the Bishop of Bath's Case, above cited: "When a lease for years shall be made good by reference, the reference ought to be a thing which has express certainty at the time of the lease made, and not a possible or casual certainty."

In Corby v. McSpadden, cited above, the lease was of premises at the rate of $55 per month "until the lessor is prepared to improve the ground with new buildings." The lessor gave notice of the termination as required under the statute, and the court say: "We are of the opinion that the lease, on account of uncertainty of duration, was inoperative for any other purpose than the creation of an estate at will. A lease, to be valid for any greater estate, must be certain as to commencement and duration. This one is certain as to commencement, but not as to termination. The certainty of duration need not * * * be named, eo nomine, but it may be made to appear by reference to certainty. Thus it is said in 2 Platt on Leases, 70: 'If land be demised to A. during the minority of B., here, if B. be of the age of 10 years, the lease will be good for 11 years, if B. shall live so long, but not otherwise; the minority ceasing with his death.' And, among other illustrations, he states that: 'It may be marked by reference to another lease already in existence, as a lease to A. for so many years as B. has in the manor of Dale; here, if B. has ten years, A. will take a term of the same extent.' The lease in question itself expresses no certainty, nor does it refer to a certainty, as limiting the time it should run. In the illustrations given, B.'s becoming of age or dying was inevitable. And so of the reference to the other lease; that lease was already in existence, with a fixed period of limitation. So the author says that, to support the lease by reference, it must refer to a thing which has express certainty at the time the lease is made. Applying these rules to the lease in question, it is apparent that it is void of any certainty whatever. Will plaintiff ever be 'prepared to improve the property with new buildings?' Is her becoming prepared as certain as death, or the expiration of a stated period of time? Instead of this provision being certain, there is scarcely any provision

limiting the time, which, in the unstability of the affairs of life and conditions of business, could be more uncertain."

In Western Transportation Company v. Lansing, supra, a lease for a definite period, giving the lessee the privilege of keeping the premises for such further time as he should choose to elect, he paying the annual rental, was held to be at most, after the expiration of the definite term named in the lease, a tenancy from year to year determinable at the pleasure of either the lessor, the lessee, or owner of the reversion upon giving requisite notice. The same principle has been recognized and applied in this state in Lea v. Hernandez and Beauchamp v. Runnels, supra. In the first case it was held that a tenancy until the premises were sold was a tenancy at the will of either party; and in the Beauchamp Case it was held that a tenancy for such time as the lessee might desire was a tenancy terminable at the will of either party.

Under these authorities, and upon principle, we feel sure of the soundness of the proposition that a lease providing that the tenant may hold the premises so long as he pays the rent is, on account of the uncertainty of the period of its duration, a mere tenancy at will; and that in the present case, where there was a holding over under the former annual holdings, and the rent payable annually, the tenancy was from year to year, terminable at the end of any year at the will of either party.

[2] Furthermore, according to appellant's theory, the contract was unilateral, embracing a promise on appellee's part, but no obligation on the part of appellant; and no consideration was shown by which appellee would be bound by such one-sided contract. The $5,000 which appellant was to pay as rental for the premises was no consideration for an agreement by which he was to have the option to keep or not to keep the farm for another year.

[3] If the contract was not for a tenancy from year to year, and extended beyond one year, then, as it was not in writing, we are of opinion that it was within the purview of the fourth subdivision of the statute of frauds, which requires all contracts for the sale or lease of real estate for a longer term than one year to be in writing. Bateman v. Maddox, 86 Tex. 546, 26 S. W. 51; Hand v. Osgood, 107 Mich. 55, 64 N. W. 867, 30 L. R. A. 379, 61 Am. St. Rep. 312.

[4] Counsel for appellant make the contention that, on account of what occurred between appellant and appellee, and appellant and Lynn Hunter, the case would be taken out of the statute of frauds, but we fail to perceive any merit in that contention. In so far as appellant is concerned, the most that can be said in reference to that matter is that appellee induced him to borrow money from Lynn Hunter with which to pay an

honest debt due to appellee. We fail to see wherein appellant was injured by that transaction. If he had not borrowed the money from Lynn Hunter, he would still be owing it to appellee; and it does not appear that he owes Lynn Hunter any more on that account than he would have owed appellee. Lynn Hunter is not a party to this suit, and, if he has any complaint against appellee on account of the matter referred to, it cannot be considered in this case; and this last statement disposes of the assignments which complain of the action of the court below in not permitting Lynn Hunter to state why he loaned appellant the money referred to, and in excluding other testimony of a similar nature.

[5] This disposes of all the questions except the contention that appellant's right to recover upon his cross-action should have been submitted to the jury. Under the assignment presenting this question, appellant states in his proposition that the evidence shows that he obtained a buyer who was able, ready, anxious, and willing to take the property at the price appellee authorized appellant to sell it. Appellant's brief does not copy or state the substance of any witness' testimony to the effect that a purchaser was procured who was willing and able to purchase the property at the price fixed. Counsel for appellee controvert appellant's statement, and the statement of facts bears out appellee's statement, which is as follows: "The only testimony bearing on the defendant's having complied with the contract of agency by furnishing a purchaser ready, willing, and able to buy is that of the defendant himself, set forth in the statement of facts on pages 25 to 28 and 30 to 31, in which the defendant says, in substance, that Mr. Boswell told him that he had a purchaser, Mr. Lundell, who would buy on the terms authorized by the plaintiff. Defendant never saw the buyer himself or talked to him. He also states that the trade was talked about between himself, Mr. Boswell, and Mr. Shofner at the time that the latter two stated that they had found a buyer. Neither Mr. Boswell nor Mr. Shofner testified in the case, nor was Mr. Lundell called, and there is no intimation in the record, either from hearsay testimony or otherwise, that either Mr. Lundell, the supposed purchaser, or Mr. Boswell or Mr. Shofner had the ability to purchase the property on the terms alleged to have been agreed to or on any other terms." This testimony fell far short of showing that appellant had any right to recover the commission sued for; and, in disposing of this question, we quote as follows from Clark v. Wilson, 41 Tex. Civ. App. 450, 91 S. W. 627: "No sale having been in fact made, in order to entitle the appellee to recover his commissions, it was necessary for him to procure a purchaser who was ready, able, and willing to buy on the terms upon which he was authorized to

sell, and that the failure to sell resulted from the fault of his principal. Brackenridge v. Claridge, 91 Tex. 532 [44 S. W. 819, 43 L. R. A. 593]. The mere fact that appellant himself made the contract of February 8th with Kibbe did not entitle appellee to commissions. This evidenced nothing more than that Kibbe and his associates were willing to buy. Appellant had not employed appellee to get a man who would agree to buy, but one who would buy, who was not only willing, but ready and able, to buy, so that nothing but appellant's unwillingness or inability to sell would prevent a consummated sale."

No error has been shown, and the judgment is affirmed.